UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
BONNIE J. SPELLMAN,

                                  Plaintiff,

      -against-

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.
------------------------------------------------------------------x

**MEMORANDUM AND ORDER**

2:21-cv-05842 (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

      Presently before the Court in this Social Security appeal, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c), are: (i) Plaintiff Bonnie Spellman's ("Plaintiff" or "Spellman") motion for judgment on the pleadings ("Plaintiff's Motion" or "Pl. Mot"), Docket Entry ("DE") [12]; Plaintiff's Memorandum of Law ("Pl. Mem."), DE [13]; and (ii) Defendant Commissioner of the Social Security Administration's ("Defendant" or "Commissioner") cross-motion for judgment on the pleadings ("Defendant's Motion" or "Def. Mot."), DE [14]; Defendant's Memorandum of Law ("Def. Mem."), DE [15]. By way of Complaint filed on October 20, 2021, Spellman commenced this action against the Commissioner pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's denial of her claim for disability insurance benefits. *See* Complaint ("Compl."), DE [1].[1] For the reasons set forth below, the Court grants Plaintiff's Motion, denies Defendant's

---

[1] The parties consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) on May 31, 2023. *See* DE [19].

Motion and remands to the Commission for further proceedings consistent with this Memorandum and Order.

## I.      BACKGROUND

The facts set forth herein are taken from the Certified Administrative Record (the "Record" or "Tr."), DE [16], and are accepted as true for purposes of the instant motions.

### A. Non-Medical Background

Spellman is a Suffolk County resident who was born on March 6, 1979, and was thirty-seven years old at her alleged disability onset date of October 1, 2016. Tr. 159, 162.   Around that time, she began experiencing migraine headaches, endometriosis, and pain in her right knee, shoulder, hip and neck. Tr. 215.  Plaintiff received her bachelor's degree in liberal studies, and she lives in Hampton Bays, New York with her spouse and two children ages eight and eleven. Tr. 33-35.  Prior to her onset of disability, Spellman worked as a reservation manager, food service manager, bartender, food server and front desk receptionist. Tr. 21.  Plaintiff's earnings and work history in the ten years prior to her onset date show that she has acquired sufficient quarters of coverage to qualify her for Social Security Disability Insurance benefits. Tr. 15.

### B. Medical Background

Plaintiff's medical records include inpatient hospital records from NYU Langone Medical Center where she was admitted and underwent right hip surgery and revision surgery. Tr. 278-89. Also included are outpatient hospital records from Hampton Medical Care, Tr. 341-447, Southampton Hospital, Tr. 479-520, and Good

Samaritan Hospital Medical Center, Tr. 313-18, several radiology reports from Stand-Up MRI of Islandia, Tr. 319-32, and records from Riverhead Chiropractic Office, Tr. 291-308. Spellman later had MRIs taken and underwent a series of steroid injections for her lumbar and cervical spine at Stony Brook Eastern Long Island Hospital. Tr. 666-70. Also included are records and reports from several doctors including: (i) Dr. John D. Hubbell ("Dr. Hubbell") at Long Island Bone and Joint LLP, Tr. 579-582, 584, 588-90, 605-07, 624-25, 684; (ii) Dr. Rasel Rana ("Dr. Rana") at Long Island Bone and Joint LLP, Tr. 586, 587, 608, 610, 686-87; (iii) Dr. Steven Samuels ("Dr. Samuels") at Industrial Medicine Associates, P.C., Tr. 598-602; (iv) Dr. Dorothy Scarpinato ("Dr. Scarpinato") at MES Solutions, Tr. 688-91; and (v) Dr. R. Mohanty ("Dr. Mohanty"), a state medical examiner, Tr. 67-71.

### 1. Treatment Records

On February 18, 2014, Plaintiff underwent right hip arthroscopic surgery with labral repair, acetabuloplasty with femoral neck osteochondroplasty, synovectomy, chondroplasty and fluoroscopy by Dr. Thomas Youm ("Dr. Youm") at NYU Hospital Center. Tr. 282. On September 29, 2015, she underwent a right hip arthroscopic revision surgery with labral repair, chondroplasty, synovectomy, lysis of adhesions, acetabuloplasty, capsular imbrication, synovectomy, and removal of a cartilaginous loose body also by Dr. Youm. Tr. 287.

Between October 2015 and May 2018, Spellman attended several appointments at Hampton Medical Care, which appeared to be her primary care provider. Tr. 341-447. On October 10, 2015, she presented with right shoulder pain

3

aggravated with movement, and her records noted a history of headaches and migraines. Tr. 341-43.  Plaintiff attended follow-up appointments on October 16 and November 10, 2015 where she sought treatment to taper her use of pain medications following her hip surgeries.  Tr. 344-51.  She presented again at Hampton Medical Care on August 16, 2016 where her medications of Relpax and Imitex for her migraines were refilled.  Tr. 353-54.  At her physical exam on September 13, 2016, the doctor noted a history of headaches, migraines, chronic lower back pain and hip pain, and she was given refills of her prescriptions.  Tr. 359-62.  At a follow-up appointment on December 27, 2016, she received another refill of her medications, and she reported that she felt well and had no neck or back pain.  Tr. 363-66.  Plaintiff returned two weeks later, on January 14, 2017, to treat a urinary tract infection but expressed no symptoms of neck pain, back pain or other arthralgias.  Tr. 367-69.  She was treated for urinary pain again at Hampton Medical Care on March 2, 2017.  Tr. 391-94.

On February 16, 2017, Plaintiff underwent an MRI of her lumbar spine at Eastern Long Island Hospital which revealed multilevel degenerative disc disease with mild to moderate stenosis of the spinal canal and mild to severe stenosis of the nerve roots.  Tr. 664.  Following the MRI, on March 13, 2017, Spellman received an epidural steroid injection in her lumbar spine at the same location.  Tr. 666.

On July 3, 2017, Plaintiff presented to Southampton Hospital following a motor vehicle collision.  Tr. 508-15.  Her clinical examination at the emergency department indicated normal range of motion in her neck, back and all extremities

Tr. 513-14.  Her gait was also normal, and she exhibited no sensory or motor deficits Tr. 514.  Upon discharge, she was diagnosed with a muscle strain and prescribed over-the-counter pain medication.  Tr. 514-15.

On August 8, 2017, a lumbar spine MRI was performed at Stand-Up MRI of Islandia due to Spellman's complaints of constant low back pain radiating to bilateral lower extremities with numbness, weakness and difficulty walking.  Tr. 329.  The MRI revealed normal vertebral alignment, without change on flexion/extension, minimal focal right foraminal annular tear, L4-5, with a normal posterior disc margin, mild bilateral noncompressive facet arthropathy, L4-5 and L5-S1, and no disc herniation, spinal stenosis or bony lesions at any level.  Tr. 328-29.  On the same day, a cervical spine MRI was performed due to complaints of neck pain radiating to bilateral upper extremities with numbness, weakness and headaches.  Tr. 331.  The MRI revealed straightening of the cervical lordosis, minimal grade spondylolisthesis, C4-5, slightly increased on flexion, minimal posterior bulging of the disc annulus, without focal neural compression, C5-6, and mild to moderate central broad-based disc herniation, C6-7, causing mild midline cord deformity.  Tr. 331-32.

On August 17, 2017, a thoracic spine MRI was performed at Stand-Up MRI of Islandia due to complaints of back pain radiating to the right extremities with numbness and weakness in right leg and arm and difficulty walking since the motor vehicle accident on July 3, 2017.  Tr. 327.  The MRI revealed T3-4 broad right paracentral subligamentous disc herniation and T4-5 subligamentous disc bulging. Tr. 327.  On September 7, 2017, a right shoulder MRI was performed due to

5

complaints of pain with numbness, weakness and moderate effect on arm movement, which revealed supraspinatus tendinosis, mild hypertrophy of acromioclavicular joint, decrease in size of the posterior labrum and possible capsular scarring along the humeral attachment of the inferior glenohumeral ligament.   Tr. 326.   On September 19, 2017, a right knee MRI was performed at the same location due to complaints of pain with clicking sound, inner and outer pain, and difficulty walking at times. Tr. 325.  The MRI revealed small joint effusion, lateral patellar tilt, medial collateral ligament sprain, cartilage loss and medial popliteal cyst.  Tr. 325.

In between her imaging studies and after her motor vehicle accident, Spellman received chiropractic treatment from July 2017 to September 2017 with Dr. Richard Bogdanski at Riverhead Chiropractic Office, P.C.  Tr. 291-308.  Plaintiff presented with complaints of moderate and stinging pain in the midback, severe and dull pain in the lower back, severe and shooting pain radiating from the right side of the neck to the right arm and hand.  Tr. 290-312.  The examinations revealed positive Kemp's test bilaterally, decreased range of motion in cervical flexion, cervical extension, cervical lateral flexion and cervical rotation, lumbar flexion, lumbar extension, lumbar lateral flexion and lumbar rotation.  Tr. 290-312.  The objective findings were decreased range of motion, mild motion palpations and spasms from static palpation. Tr. 292-303.  From the initial examination on July 7, 2017 until September 1, 2017, the overall prognosis was unchanged.  Tr. 308.

On July 12, 2017, Plaintiff had her first visit with Dr. Hubbell at Long Island Bone and Joint LLP.  Tr. 588.  At the time, Spellman's pain was intermittent and

involved the right ankle, elbow, hip, knee, shoulder and wrist.  Tr. 588.  She described her pain as dull and aching, noting that it woke her up from sleep, and it rated as a 5 out of 10.  Tr. 588.  Dr. Hubbell's assessment revealed right shoulder impingement, degeneration of the bones and disks in the neck, a tear of the right hip, a tear of the lateral meniscus of the right knee, sprain of right ankle and a swollen right elbow. Tr. 590.  On September 11, 2017, Plaintiff met with Dr. Rana at Long Island Bone and Joint LLP.  Tr. 586.  Spellman presented with back pain located in her upper and lower back, which radiated to the right and left thighs.  *Id.*  Her symptoms were aggravated by prolonged standing, sitting and laying, but symptoms were relieved by rest.  *Id.*  Dr. Rana's assessment was that Spellman suffered from a cervical sprain, a lumbar sprain, a herniated disc cervical, right cervical pinched nerve root and facet joint syndrome.  Tr. 587.  Plaintiff saw Dr. Hubbell again on October 30, 2017.  Tr. 582.  Her pain was similar, and Dr. Hubbell concluded that Spellman had a tear of the medial meniscus in her right knee and impingement syndrome of the right shoulder.  Tr. 584.

On November 28, 2017, Plaintiff presented at Hampton Medical Care for renewal of her migraine medication and continued painful urination where she was treated and given refills of her prescriptions.  Tr. 395-96.  In a review of systems, she reported no back pain, neck pain or other arthralgia, and her clinical examination was unremarkable.  Tr. 396.  One week later, on December 5, 2017, Spellman underwent another clinical exam, and she expressed no back tenderness, normal

range of motion in all extremities, intact reflexes, unimpaired sensation and no motor deficits. Tr. 450.

Plaintiff received an epidural steroid injection in her cervical spine at Eastern Long Island Hospital on December 20, 2017. Tr. 672. On March 1, 2018, a right shoulder MRI was performed at the same location. Tr. 674-75. The MRI revealed partial thickness undersurface tears of the distal supraspinatus and infraspinatus tendons, mild bone bruising at the proximal humerus, separation of the acromioclavicular joint, acromioclavicular joint effusion, and sprains of the acromioclavicular, coracoacromial and middle glenohumeral ligaments. Tr. 675. Spellman then underwent a right shoulder arthrogram. Tr. 680.

On March 19, 2018, Plaintiff saw Dr. Hubbell. Tr. 580. She described her pain as intermittent and rated it a 5 out of 10, and on examination, Spellman exhibited tenderness and some stiffness in her neck, right shoulder, hand, hip, knee and ankle. Tr. 580-81. She also demonstrated abnormalities in functional testing. Tr. 580-81. Plaintiff exhibited normal gait, intact sensation in all extremities, good coordination and unimpaired reflexes. Tr. 580-81. Additionally, her muscle strength was generally intact. Tr. 580-81. After reviewing Spellman's imaging studies, Dr. Hubbell diagnosed a right rotator cuff sprain and right knee chondromalacia, which is a common condition marked by the softening of the cartilage on the underside of the kneecap. Tr. 581. To manage these conditions, Dr. Hubbell prescribed physical therapy. Tr. 581, 639-44.

On April 19, 2018, Plaintiff presented to Peconic Physical Therapy for an evaluation. Tr. 638. She reported pain in her right shoulder, knee, cervical spine and lumbar spine. Tr. 639. Spellman attended physical therapy through June 2018 noting that her epidural injections failed to improve her back pain, and she reported no change in symptoms. Tr. 642-43.

Plaintiff underwent x-rays of her pelvis and right hip on April 27, 2018 at Eastern Long Island Hospital. Tr. 681. The findings were unremarkable. Tr. 681. That same day, she also received an epidural steroid injection in her cervical spine. Tr. 682. On May 25, 2018, Plaintiff had an appointment at Hampton Medical Care complaining of frequent migraines, but she denied back pain, neck pain or other arthralgias. Tr. 525. She was given a refill of her prescriptions. Tr. 525-26.

Spellman returned to Dr. Hubbell at Long Island Bone and Joint on May 29, 2018, and her diagnosis was unchanged. Tr. 579. Plaintiff had another visit with Dr. Hubbell on August 13, 2018 where she complained of pain in her right knee and right shoulder, noting that the pain was worsening and classified it as an 8 out of 10. Tr. 605. She described the pain as sharp, dull, stabbing, throbbing, aching and burning, and noted that it caused her to wake up from sleep. Tr. 605. Spellman was again diagnosed with a sprain of the right rotator cuff capsule and chondromalacia of the right knee, as well as carpal tunnel syndrome of the right wrist. Tr. 607. At this visit, Dr. Hubbell concluded that she was fully disabled until further notice. Tr. 607.

On March 11, 2019, Plaintiff met with Dr. Rana to follow up on her lumbar and cervical spine pain. Tr. 608. Spellman reported constant pain and muscle spasms in

her middle and lower back, particularly on her right side and numbness and tingling down her right leg. Tr. 608. Plaintiff expressed increased pain when lifting, breathing and sneezing and stated that physical therapy provided no relief. Tr. 608. Dr. Rana diagnosed Plaintiff with a lumbar sprain, pain radiating from the lower back down the leg, degeneration of the bones and disks in the neck, pinching of the nerve root in the lower back and a cervical sprain. Tr. 610. Plaintiff continued to see Drs. Rana and Hubbell for additional treatment, with visits on March 25 and April 15, 2019. Tr. 608, 611, 614. During these examinations, Plaintiff showed tenderness and stiffness in her neck and back, as well as decreased sensation in the right arm. Tr. 609, 611-13, 615-16. She also exhibited normal posture, full strength in nearly all muscle groups, intact reflexes, negative straight leg raise testing bilaterally and an unimpaired gait. Tr. 609, 611-13, 615-16.

On August 16, 2019, Spellman visited Dr. Hubbell at Orlin & Cohen Medical Specialists Group, [2] complaining of right knee pain. Tr. 624. Dr. Hubbell's physical examination of the right shoulder revealed tenderness at the anterior shoulder, shoulder strength as forward flexion 4/5, and external rotation 4+/5. The physical examination of the right knee revealed mild swelling, tenderness and the range of motion as full flexion and extension without pain, full quadriceps strength, and full hamstring strength. Tr. 624-25. Plaintiff also had a positive McMurray test. Tr. 625. At this visit, Spellman was diagnosed with chondromalacia of the right knee, a

---

[2] This appears to be a different medical provider although the same doctor, but the parties fail to provide any further detail.

tear of the medial meniscus, impingement syndrome of the shoulder region, a sprained rotator cuff and pinching of a nerve root in the lower back.  Tr. 625.

Spellman attended more appointments with Dr. Hubbell for right foot pain on October 1, October 23 and October 30, 2019.  Tr. 626-34.  Plaintiff denied having numbness, weakness, back pain, neck pain or joint pain or swelling at these appointments.  Tr. 626-27. 629-30, 632-33, 646.  She had bunionectomy surgery of her right foot on October 16, 2019 at Orlin and Cohen Orthopedic Associates.  Tr. 635-37.  On December 11, 2019, she received another epidural steroid injection in her cervical spine at Eastern Long Island Hospital.  Tr. 670.

### 2.  Medical Opinions

#### a.  Dr. Hubbell

On January 23, 2020, Dr. Hubbell completed a medical source statement on Spellman's behalf.  Tr. 684.  Plaintiff's diagnoses were a right shoulder labral tear, right shoulder rotator cuff tearing and chondromalacia of the right knee.  Tr. 684-85.  Dr. Hubbell indicated that Spellman could not constantly lift any weight, could often lift 0-5 pounds, occasionally lift 5-10 pounds and 10-20 pounds, but could never lift 20-50 pounds.  Tr. 684-85.  He further concluded that Plaintiff could stand and/or walk 5 hours in an 8-hour workday but could only do so without interruption for 1.5 hours and that Plaintiff's ability to sit was not affected by her impairments.  Tr. 684-85. Dr. Hubbell determined that the Spellman could never climb or crawl, could occasionally balance, stoop, kneel, push/pull or reach, and could frequently feel/handle, but she should limit her exposure to heights.  Tr. 684-85.

#### b.  Dr. Rana

On December 2, 2019, Dr. Rana completed a medical source statement on Spellman's behalf. Tr. 686-87. Dr. Rana diagnosed Plaintiff with lumbar and cervical pinched nerve root, cervical spinal stenosis, narrowing of spine and herniated nucleus pulpous. Tr. 686-87. Dr. Rana indicated that Spellman's ability to lift and carry was affected by the impairment in that Plaintiff could never lift any weight constantly or frequently, could occasionally lift 0-5 pounds and 5-10 pounds, but could never lift 10-20 pounds or 20-50 pounds. Tr. 686-87. Spellman's standing and walking was also affected by the impairment in that Plaintiff could stand or walk a total of 2 hours in an 8-hour workday and could only stand or walk without interruption for half an hour. Tr. 686-87. Spellman could sit a total of 8 hours in an 8-hour workday, but she may need to stretch to avoid stiffness. Tr. 686-87. Dr. Rana determined that Plaintiff could frequently balance or kneel, occasionally bend reach, feel or handle, but could never constantly perform any postural or manipulative activities, nor climb, stoop, crouch, crawl, push or pull. Tr. 687. Dr. Rana also indicated that Spellman should have limited exposure to heights, moving machinery and vibration. Tr. 687.

### c. Dr. Samuels

On August 10, 2018, at the request of the Social Security Administration (the "SSA"), Plaintiff received an internal medicine examination from Dr. Samuels. Tr. 598-602. Spellman's chief complaint was significant pain radiating from her neck into her right shoulder and arm, which she described as shock-like and burning down to her fingers. Tr. 598. In addition, Plaintiff also reported pain radiating across her

back – described as burning, aching, and stiff – and in her right lower extremity – described as electric shock-like and burning along the sciatic nerve.  Tr. 598.

Dr. Samuels diagnosed Plaintiff with:  (1) cervical disc disease secondary to a motor vehicle accident, (2) pinched nerve in her right shoulder and arm,  (3) lumbar disc herniation and disc bulging secondary to motor vehicle accident, (4) low back pain with annular tear, (5) nerve damage in her right lower extremity consistent with sciatica secondary to motor vehicle accident, (6) injury to a ligament in her right knee, (7) right shoulder injury with torn ligaments and labral tear rotator cuff, (8) a history of migraine headaches, (9) a history of endometriosis, (10) a history of surgical repair of a right hip labral tear, and (11) a history of laparoscopic surgery for endometriosis. Tr. 601-02.  Dr. Samuels indicated moderate to marked restrictions on heavy lifting, carrying, pushing, pulling, reaching overhead, using her right upper extremity and shoulder, squatting, kneeling, climbing, going up and down stairs, prolonged walking and standing.  Tr. 602.

### d. Dr. Scarpinato

On August 16, 2018, Spellman received an orthopedic examination from Dr. Scarpinato who examined Plaintiff's cervical spine, right shoulder, hips, thoracolumbar spine and right knee and also reviewed her medical records.  Tr. 689-92.  Dr. Scarpinato classified Spellman's cervical spine strain and thoracolumbar spine strain as "resolved," and her right shoulder sprain and right knee sprain as "resolving."  Tr. 691.  Dr. Scarpinato determined that Plaintiff had an orthopedic

disability, and she may perform activities of daily living and full-time employment without any heavy lifting and limited walking.  Tr. 691.

### e. Dr. Mohanty

On September 12, 2018, state agency medical consultant Dr. Mohanty reviewed Spellman's medical records.  Tr. at 67-71.  Dr. Mohanty determined Plaintiff's impairments were spine disorders, dysfunction to the major joints, migraines and disorders of female genital organs.  Tr at 67.  Spellman's exertional limitations were identified as:  (i) occasionally lifting and/or carrying 20 pounds, (ii) frequently lifting and/or carrying 10 pounds, (iii) standing and/or walking for about 6 hours in an 8-hour workday, (iv) sitting for about 6 hours in an 8-hour workday, and (v) pushing and pulling with no limitations.  Tr. 69.  Dr. Mohanty concluded that Plaintiff was able to occasionally balance, stoop, kneel, crawl and climb ramps, stairs, ladders, ropes and scaffolds.  Tr. 69.  Dr. Mohanty found Spellman to be limited in reaching right in front and/or laterally, left overhead and right overhead.  Tr. 70.  Additionally, Plaintiff's right-hand handling was indicated as limited, but fingering and feeling were not limited.  Tr. 70.  Finally, Dr. Mohanty determined that Spellman should avoid concentrated exposure to noise and hazards such as machinery and heights.  Tr. 71.

## C. Procedural History

### 1. Plaintiff's Application, Denial and Administrative Hearing

Plaintiff filed a Title II application for Social Security Disability Benefits on June 22, 2018, alleging disability as of October 1, 2016, due to migraine headaches, endometriosis and pain in her right knee, shoulder, hip and neck.  Tr. 215.  By notice

dated September 13, 2018, the SSA denied Spellman's claims.  Tr. 79.  She timely appealed by requesting a hearing before an Administrative Law Judge ("ALJ") on October 18, 2018.  Tr. 91.

Plaintiff had a hearing before ALJ Benjamin Chaykin ("ALJ Chaykin" or "the ALJ") on January 30, 2020, where she appeared with counsel and testified.  Tr. 30, 115.  At the hearing, Spellman stated that she lives with her spouse, mother and two children.  Tr. 33-34.  Plaintiff drives four to five days a week to pick her children up from the bus or drop them off at a game and will drive herself to doctor's appointments or the grocery store if no one else is around to drive her.  Tr. 34.  Spellman also brings her husband for larger trips to the grocery store, her children help her with cleaning, and she has to take breaks between vacuuming rooms.  Tr. 45-46.

Plaintiff further testified that on a typical day she would wake her children up for school, put together their breakfast, and run them out the bus.  Tr. 49.  Afterwards, she would come back home and make the bed or make sure the laundry was ready to be brought downstairs.  Tr. 49.  She would have her husband bring anything downstairs before he left for work in the morning.  Tr. 49.  During the day, Spellman would try to make sure that the house was tidy and/or try to prepare something for dinner.  Tr. 49.  In the afternoon, she would get the kids off the bus and drop them off at practices.  Then, her husband would arrive home about an hour after that.  Later, Spellman would help her children with homework, and they would go to bed.  Tr. 49.

Spellman testified that she has not been able to work because of the pain in her neck and back, and the pain running down her right arm and leg. Tr. 35. Plaintiff is right-handed, but she does not trust her right hand because she has dropped too many things. Tr. 43. Spellman stated that she has a considerable amount of numbness that comes from the neck and goes down her arms preventing her from typing at desk level and chopping vegetables. Tr. 42. Plaintiff has trouble getting dressed and doing things around the house. Tr. 43-44. She can stand for thirty minutes and walk one block before becoming very fatigued due to extreme pain in her legs. Tr. 47.

At the hearing, vocational expert James Soldner ("the VE") also testified. Tr. 52. The VE classified Spellman's past work as a composite of four jobs which included reservation manager, food service manager, bartender and food server, and Plaintiff's other job was characterized as a front desk receptionist. Tr. 55-56. The ALJ posed a hypothetical that identified an individual of the same age, education and work history as Spellman and asked if the hypothetical person could perform the Plaintiff's past work with the following limitations: capacity to perform light work with (1) occasional climbing of ladders, ropes or scaffolds, (2) occasional climbing of ramps or stairs, (3) occasional crouching, balancing, kneeling or crawling, (4) no concentrated exposure to vibration, loud noise or dangerous hazards such as unprotected heights or dangerous machinery, (5) no overhead reaching but frequent reaching in all the directions bilaterally, and (6) frequent handling and fingering with the dominant right upper extremity. Tr. 56. The VE testified that the Plaintiff's past work was

16

eliminated.  Tr. 56-57.  Then, the ALJ asked a clarifying question whether the front desk receptionist job could be performed with these limitations, and the VE responded that this job would fit the hypothetical.  Tr. 56-57.

The ALJ placed further restrictions on the hypothetical claimant, limited to only occasional reaching, no overhead reaching, only occasional reaching in all other directions with the dominant right upper extremity, and no reaching and frequent reaching in all the directions with the non-dominant left upper extremity.  Tr. 56. The VE responded that with these limitations work as a front desk receptionist would be precluded.  Following this, the ALJ asked if there were other jobs in the national economy at the light work exertion level with these limitations, and the VE responded with jobs including a school bus monitor (1,000 jobs nationally), counter clerk (1,700 jobs nationally), fruit distributor (3,000 jobs nationally).  Tr. 57-58.  The ALJ further limited the hypothetical claimant to only sedentary work performed in the national economy.  Tr. 58.  The VE responded that such a claimant could work as a callout operator (4,600 nationally) and surveillance system monitor (6,700).  Tr. 58.

Then, the ALJ asked if the jobs listed at the light exertion level would remain if a claimant was further restricted to occasional handling and fingering with the dominant right upper extremity, and the VE testified affirmatively.  Tr. 58-59.  The ALJ further inquired if there would be jobs for an individual that would be absent from work two or more days per month or off task more than the ten percent of the workday in addition to normal breaks.  Tr. 59.  The VE testified that there would be

jobs for such an individual, but an excess of ten percent of off task behaviors are not available.  Tr. 59.

### 2.  *The ALJ's Decision*

ALJ Chaykin issued his decision on March 27, 2020, applying the five-step process described below pursuant to 20 C.F.R § 404.1520.  Tr. 10.  At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of October 1, 2016.  Tr. 15.  At step two, he found that Spellman has the severe impairments of spine disorder, right shoulder disorder, right knee disorder, migraines, endometriosis and right carpal tunnel syndrome, significantly limiting her ability to perform the basic demands of work activity.  Tr. 15.  At step three, ALJ Chaykin determined that Plaintiff's impairments, alone or in combination, did not meet or medically equal the severity of any regulation's listed impairments, specifically listings 1.02 for musculoskeletal system and major dysfunction of a joint, 11.00 for neurological system, or 1.08 for soft tissue injury.  Tr. 16.  The ALJ then assessed Spellman's residual functional capacity[3] and determined that she had the RFC to perform a range of light work,[4] with the following limitations:

- Occasional climbing of ladders, ropes, or scaffolds;

- Occasional climbing of ramps or stairs;

- Occasional stooping, crouching, balancing, kneeling, or crawling;

---

[3] A residual functional capacity ("RFC") determination identifies what work a claimant can still perform, despite her limitations.  *See* 20 C.F.R. § 404.1565.

[4] Light work involves lifting no more than 20 pounds a time, frequent lifting or carrying of objects weighing 10 pounds and standing and/or walking, off and on, for a total of approximately six hours of an eight-hour day.  *See* 20 C.F.R § 404.1567(b).

- No concentrated exposure to vibration, loud noise, or dangerous hazards such as unprotected heights or dangerous machinery;

- No overhead reaching and frequent reaching in all other directions with the non-dominant left upper extremity;

- No overhead reaching and occasional reaching in all other directions with the dominant right upper extremity; and

- Frequent handling and fingering with the dominant right upper extremity.

*See id.*

ALJ Chaykin then addressed step four, considering the Plaintiff's testimony and the medical evidence. Tr. 21. He found that Spellman was unable to perform any past relevant work. Tr. 21. At step five, the ALJ determined that based on the Plaintiff's RFC, and the vocational factors of age, education and work history, jobs exist in significant numbers in the national economy that the Spellman can perform including school bus monitor, counter clerk and fruit distributor. Tr. 21-22. The ALJ further concluded that if the Plaintiff were limited to only sedentary work with no more than occasional handling with the dominant right upper extremity, Plaintiff could perform work as a surveillance system monitor or call out operator. Tr. 22. Accordingly, the ALJ found that Spellman was not under a disability as defined in the Act from October 1, 2016, through the date of his decision. Tr. 22.

### 3. *The Instant Action*

ALJ Chaykin's decision became final when the Appeals Council denied Plaintiff's request for review on August 20, 2021. Tr. 1. Then on October 20, 2021, Spellman filed her Complaint against the Commissioner. *See* Compl. The parties filed their motions for judgment on the pleadings on August 10, 2022. *See* Pl. Mot.;

Def. Mot.  The parties consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) on May 31, 2023.  *See* DE [19].  For the reasons set forth below, the Court grants Plaintiff's Motion, denies Defendant's Motion and remands this case for further proceedings consistent with this Memorandum and Order.

## II.    LEGAL STANDARD

### A. Motion for Judgement on the Pleadings

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union,* 47 F.3d 14, 16 (2d Cir. 1995).  The Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing a decision of the Commissioner of Social Security, with or without remanding the case for a rehearing."  42 U.S.C. § 405(g).

The Court's review of a Commissioner's denial of disability insurance benefits is limited to two inquiries:  (1) whether the Commissioner applied the correct legal standards in reaching a decision, and (2) whether the Commissioner's factual findings were "supported by substantial evidence in the record as a whole."  *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015); *see Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013).  The Court does not substitute its own judgment for that of the Commissioner's "or determine *de novo* whether [the claimant] is disabled."  *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012); *see Greek,* 802 F.3d at 374-75 ("The ultimate determination of whether a person has a disability within the meaning of the Act belongs to the Commissioner.").

Inquiry into legal error requires the court to determine whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted).

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel,* 177 F.3d 128, 132 (2d Cir. 1999) (internal quotation and citation omitted). Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian,* 708 F.3d at 417 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)) (internal quotation marks and citations omitted). Essentially, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, *see* 42 U.S.C. § 405(g), and therefore, the relevant question is not whether substantial evidence supports plaintiff's position, but whether "substantial evidence supports *the ALJ's decision.*" *Bonet ex rel. T.B. v. Colvin,* 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original); *see also Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must

21

be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review"). This is a "highly deferential standard of review." *Negron v. Berryhill,* 733 F. App'x 1, 2 (2d Cir. 2018).

### B. Social Security Disability Standard

To qualify for disability benefits under Title II of the Act an individual must be: (i) insured for disability benefits, (ii) not have attained retirement age, (iii) be a U.S. citizen or a foreign national under certain circumstances, and (iv) have a "disability." 42 U.S.C. § 423(a)(1). The Act defines "disability" to mean that a claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death[,] or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see Cichocki v. Astrue,* 729 F.3d 172, 176 (2d Cir. 2013). The Act further states that the impairment must be "of such severity that [the claimant] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see also Shaw v. Chater,* 221 F.3d 126, 131-32 (2d Cir. 2000).

The Social Security Administration has promulgated regulations prescribing a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability. *See* 20 C.F.R. §§ 404.1520; 416.920. The Second Circuit has summarized this evaluation process as follows:

- First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity;

- Second, if she is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities;

- Third, if the claimant suffers such an impairment, the Commissioner evaluates whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider her disabled without considering vocational factors such as age, education and work experience;

- Fourth, assuming the claimant does not have a listed impairment, the Commissioner evaluates whether, despite the claimant's severe impairment, she has the RFC to perform her past work;

- Finally, if the claimant is unable to perform her past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).  The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working.  *See Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 219-20 (E.D.N.Y. 2021).

## III.   DISCUSSION

### A.  The ALJ's Evaluation of Medical Opinion Evidence

Initially, Plaintiff argues that the ALJ erred by failing to properly evaluate the medical opinions submitted when determining her RFC assessment, challenging step four of the evaluation process set forth above.  Pl. Mem. at 12-15.  Spellman further contends that the ALJ improperly relied on Dr. Mohanty's opinion because it was rendered without treating or examining her and was issued without having full access to the medical records.  Pl. Mem. 15.

As Plaintiff's application for disability insurance benefits was filed after March 27, 2017, her claims are governed by the new regulations concerning the consideration of medical opinions. *See Darcy v. Comm'r of Soc. Sec.*, No. 20-cv-4769, 2023 WL 2035945, at *2 (E.D.N.Y. Feb. 16, 2023) (citing 20 C.F.R. § 404.1520c). "Under the new regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight." *Knief v. Comm'r of Soc. Sec.*, No. 20-cv-6242, 2021 WL 5449728, at *6 (S.D.N.Y. Nov. 22, 2021) (quotation marks omitted). Indeed, ALJs no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ "must evaluate the persuasiveness of all medical opinions in the record based on five factors:  (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the medical opinion." *Rosario v. Comm'r of Soc. Sec.*, No. 21-cv-1151, 2022 WL 4593069, at *5 (S.D.N.Y. Sep. 30, 2022) (citing 20 C.F.R. § 404.1520c(c)(1)-(5)).

Supportability and consistency are the most important factors in evaluating a medical opinion. *Id.* (citing 20 C.F.R. § 404.1520c(b)(2)).  For the "supportability" factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  For the "consistency" factor, "[t]he more consistent a medical

opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). "As part of his or her decision, the ALJ must explain how the factors of supportability and consistency were considered." *Rosario*, 2022 WL 4593069, at *5 (citing 20 C.F.R. § 404.1520c(b)(2)). Generally, the ALJ may, but is not required to, explain how the other factors were considered. *Id.* § 404.1520c(b)(2); *see Ginsberg v. Comm'r of Soc. Sec.*, No. 21-CV-0207 (JMA), 2023 WL 2528295, at *3 (E.D.N.Y. Mar. 15, 2023). To reach a conclusion supported by substantial evidence, however, the ALJ must at a minimum provide some explanation how the factors of supportability and consistency are weighed. *See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d. Cir. 2022) (remanding where the ALJ did not address the opinion's supportability or explain how the opinion was consistent with the record, except to conclude that it was); *Acheampong v. Comm'r of Soc. Sec.*, 564 F.Supp.3d 261, 270 (E.D.N.Y. 2021) (remanding where the ALJ failed to explain how she considered the supportability and consistency factors).

Applying these standards, the Court concludes that the ALJ properly considered the medical evidence under the appropriate regulations such that Spellman's RFC assessment is supported by substantial evidence. In finding that the Plaintiff was capable of light work with limitations, the ALJ relied principally on Dr. Mohanty's opinion and determined that the opinions of Drs. Rana, Hubbell, Samuels and Scarpinato were unpersuasive. With regard to the opinions of Drs. Rana and

25

Hubbell, the ALJ complied with the regulations articulating the two most important factors of supportability and consistency.  Tr. 16-21; *see* 20 C.F.R. § 404.1520c(c).  The ALJ recognized that Drs. Rana and Hubbell were both orthopedic specialists as well as Plaintiff's treating providers, yet based on his evaluation of the whole record, the ALJ found that their specialties and treating relationships alone were insufficient to support the limitations that these providers set forth in their respective opinions.  Tr. 20.  The ALJ compared Drs. Rana's and Hubbell's opinions with their respective underlying treatment records, as well as with the objective and other evidence throughout the record and permissibly found the limitations that each provider offered to be unsupported and inconsistent.  Tr. 20.  The explanations as to these opinions are sufficient under the current regulations.

The same is true for Drs. Samuels's and Scarpinato's opinions.  The ALJ noted that Dr. Samuels's opinion was supported by examination findings and explanation but that it was imprecise and vague as to the specific degree of limitation he imposed in his opinion.  Tr. 20, 598-602.  Dr. Samuels set forth moderate to marked restrictions in various exertional, postural, and manipulative categories, such as "heavy lifting" and "prolonged walking," but he never explained, for instance, what weight was considered "heavy" or what time or distance was considered "prolonged." Tr. 20, 598-602.  As a result, the ALJ permissibly discounted Dr. Samuels's opinion. Further, the ALJ found Dr. Scarpinato's opinion that Plaintiff could perform her "activities of daily living and full-time employment without any heavy lifting and with limited walking" to be imprecise and vague.  Tr. 20, 691.  Dr. Scarpinato failed

to define the weight that constituted "heavy lifting" or the distance or time that comprised "limited walking." Tr. 20, 691.  Thus, the ALJ reasonably concluded that this opinion was unsupported and inconsistent with the record as a whole, and thereby complied with the new regulations in his analysis of this opinion.

Finally, although Spellman argues that the ALJ's reliance on Dr. Mohanty's opinion was erroneous because it was rendered without treating or examining her and without having full access to the medical record, Pl. Mem. at 15, the ALJ properly relied on this opinion.  He explained that Dr. Mohanty's findings were supported by Plaintiff's medical records and was consistent with the record "showing limitations to a limited range of light work, given radiological and other findings," while acknowledging the opinion was "vague as to the extent of limitation in handling with the right upper extremity." Tr. 19-20.  The ALJ further relied on the extensive treatment records and the hearing testimony to determine Spellman's RFC.  Pl. Tr. 17-21.  Ultimately, the ALJ is responsible for assessing one's RFC, and here he reasonably "weigh[ed] the conflicting evidence in the record" in reaching his conclusion and applied the appropriate standard in doing so.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *Richardson v. Perales*, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."); *see also Cage*, 692 F.3d at 122 ("In our review, we defer to the Commissioner's resolution of conflicting evidence."); *see* 20 C.F.R § 404.1546(c).  Accordingly, there is substantial evidence to conclude that Plaintiff has the RFC to complete light work

with limitations despite her medical conditions, and Spellman's Motion is denied and the Commissioner's Motion is granted as to this issue.

### B. The ALJ's Evaluation of the Vocational Expert's Testimony

Next, Plaintiff argues that the ALJ's decision is not supported by substantial evidence in that he failed to meet his burden demonstrating that there are a significant number of jobs in the national economy that Spellman could perform, challenging step five of the evaluation process. *See* Pl. Mem. at 15. The Court agrees.

As set forth above, in the five-step inquiry for evaluating disability claims, the applicant bears the burden of proof in the first four steps, while the Commissioner bears the burden in the fifth. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The final step requires the Commissioner to determine whether there is other substantial gainful work in the national economy which the claimant could perform. *Id*. To determine the physical exertion requirements of work in the national economy, the SSA classifies jobs as "sedentary, light, medium, heavy, and very heavy." 20 C.F.R. § 404.1567. Light work involves lifting no more than 20 pounds at a time, frequent lifting or carrying of objects weighing 10 pounds and standing and/or walking, off and on, for a total of approximately six hours of an eight-hour day. *See* 20 C.F.R § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools," as well as sitting with occasional walking and standing. 20 C.F.R. § 404.1567(a).

Work which exists in the national economy means potential jobs that exist in significant numbers either in the region where such individual lives or in several

regions of the country.  42 U.S.C. § 423.  Neither the Act nor applicable regulations define "significant numbers," however, and the Second Circuit has not "set any bright line rule regarding the number of jobs needed to satisfy the Commissioner's burden at step five." *Maldonado v. Comm'r of Soc. Sec.*, No. 21-CV-7594, 2023 WL 243617, at *10 (S.D.N.Y. Jan. 18, 2023).  Courts have found national economic totals around 10,000 jobs to be sufficiently "significant" to meet the Commissioner's burden, *see Sanchez v. Berryhill*, 336 F. Supp. 3d 174, 177 (W.D.N.Y. 2018); *Rosa v. Colvin*, No. 3:12-cv-0170, 2013 WL 1292145, at *9 (N.D.N.Y. 2013), and have remanded decisions where ALJs found national economy job numbers below the 10,000-job mark to be "significant."  *See Roberto v. Saul*, No. 20-cv-1923, 2021 29 WL 3912298, at *7 (E.D.N.Y. Sep. 1, 2021) (finding that 4,573 was not a "significant number" of jobs and remanding because "courts have been 'troubled' when fewer than 10,000 jobs in the national economy were identified"); *Kathy H. v. Comm'r of Soc. Sec.*, No. 5:19-CV-684 (ATB), 2020 WL 3960846, at *16 (N.D.N.Y. Jul. 13, 2020) ("8,991 jobs in the *national* economy are not sufficient jobs to sustain the Commissioner's burden at step five . . . .") (emphasis in original) (citing *Peach v. Berryhill*, No. 1:17-cv-201, 2018 WL 4140613, at *3-5 (W.D.N.Y. Aug. 30, 2018)); *Ramos v. Berryhill*, No. 3:15-cv-1368, 2017 WL 838091, at *4 (D. Conn. Mar. 3, 2017) ("I remand to the ALJ to consider whether 100 jobs in the region and 4,000 nationally is a 'significant number.'"); *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 229-31 (N.D.N.Y. 2015) (finding 5,160 jobs to not be a "significant number" and remanding for further proceedings); *Robinson v. Astrue*, No. 08-cv-4747, 2009 WL 4722256, at *2 (E.D.N.Y. Dec. 9, 2009)

29

(questioning whether 200 jobs locally and 3,000 jobs nationally qualified as "significant" and remanding for further proceedings).

Moreover, Courts have remanded decisions where ALJs have found national economic job numbers "significant" but have failed to elicit testimony regarding the underlying regional job numbers. *See Wayne M. v. Saul*, No. 3:20-cv-465, 2021 WL 1399777, at *16-17 (D. Conn. Apr. 14, 2021) (remanding after concluding that 8,000 national jobs insignificant particularly where "such numbers are not accompanied by any regional or local availability"); *Terri G. v. Comm'r of Soc. Sec.*, No. 18- cv-0066, 2019 WL 1318074, at *11 (N.D.N.Y. Mar. 22, 2019) (remanding an ALJ's finding that 9,493 national jobs was significant based on a lack of VE testimony regarding regional job numbers); *see also Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 223 n.8 (E.D.N.Y. 2021) (While regional availability of "document preparer" positions ultimately had no effect on the analysis because the court determined such jobs obsolete, the court further noted that the regional availability of such positions "should be (and was not) made part of the record."). Indeed, "[i]solated  jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'" 20 C.F.R. § 404.1566(b); *see Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) ("A vocational expert testified to the existence of such jobs at the national and *regional* level. The ALJ was entitled to credit that testimony . . . .") (emphasis added) (citing 20 C.F.R. § 404.1566).  While a significant number of jobs may exist in the regional *or* national economy, testimony regarding regional job availability should be considered at step five for the

Commissioner to meet his burden.  *See Zacharopoulos*, 516 F. Supp. 3d at 223 n.8; *Terri G.*, 2019 WL 1318074, at \*11.

Applying these standards, the Court concludes that the ALJ failed to carry his burden at step five making the conclusion that a significant number of jobs in the national economy exists that Plaintiff can perform unsupported by substantial evidence.  The VE testified that with respect to light-duty work only 1,000 school bus monitor jobs, 1,700 counter clerk jobs and 3,000 fruit distributor jobs are available in the national economy that Plaintiff could perform.  Tr. 22.  For sedentary work, only 6,700 jobs of surveillance system monitor and 4,600 call out operator job are available in the national economy.  Tr. 22.  The ALJ failed to inquire as to the regional availability of these jobs, however, which should be part of the administrative record.

Further, Spellman argues that as least one court has determined that that the position of surveillance system monitor, which accounts for 6,700 available jobs, is obsolete.  Pl. Mem. at 18 (citing *Cunningham v. Astrue*, 360 F. App'x 606, 615 (6th Cir. 2010) (finding that the positions of document preparer and security camera monitor "appear obsolete" and directing remand)).  Defendant counters that Plaintiff had the opportunity to cross-examine the vocational expert on this issue but failed to do so.  Def. Mem. at 21.[5]  While true that a claimant has the general burden to prove she has a disability under the definitions of the Act, "the burden shifts to the

---

[5] Defendant also notes that the VE testified that the jobs indicated were merely "representative examples," meaning that there were additional jobs that could still be performed with the limitations of Plaintiff's RFC.  *See* Def. Mem. at 21; Tr. 58.  The record is not fully developed on this issue, however, and because the Commissioner has the burden at step five to demonstrate that a significant number of jobs in the national economy exist that Plaintiff can perform, the Commissioner can inquire further as to these additional jobs on remand.  *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

Commissioner at step five 'to show there is other work that [the claimant] can perform.'" *Corey S. v. Comm'r of Soc. Sec.*, No. 5:20-CV-0678 (ML), 2021 WL 2935917, at *12 (N.D.N.Y. Jul. 13, 2021) (alteration in original) (remanding for further proceedings where the Court concluded that the "overwhelming evidence" demonstrated that the position of document preparer was obsolete) (quoting *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014)).   Indeed, deducting the surveillance system monitor jobs from the step five analysis would establish just over 10,000 jobs in the national economy that Plaintiff could perform.   Because this number is on the border of what courts in this Circuit find "significant," coupled with the absence of evidence concerning regional jobs availability, the ALJ's finding that Plaintiff could perform other work in the national economy is not supported by substantial evidence. *See Terri G.*, 2019 WL 1318074, at *11 (remanding where the four jobs identified by the VE constitute a total of only 9,493 jobs in the national economy and the VE did not identify the regional numbers for jobs available to the plaintiff).   Accordingly, the Commissioner failed to carry his burden in step five, and the Court grants Plaintiff's Motion and denies the Commissioner's motion and remands her appeal for further proceedings on this issue.

### C. Remand of Plaintiff's Appeal

Federal regulations explicitly authorize a court reviewing decisions of the Commissioner to order further proceedings when appropriate.   42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing."). "[W]here the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005). "That is, when 'further findings would so plainly help to assure the proper disposition of [the] claim,'" remand is particularly appropriate. *Id.* (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)); *see also Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). This is generally the case if there are gaps in the administrative record or if the ALJ has applied an improper legal standard. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). In such cases, the Court will remand the case for further development of the evidence. *Id.*; *see Collins v. Comm'r of Soc. Sec.*, No. 20-cv-4693, 2021 WL 3054964, at \*5 (E.D.N.Y. July 20, 2021).

Here, remand for further development of the record is appropriate because the ALJ failed to sufficiently determine whether there are significant numbers of jobs that Plaintiff can perform in the local, regional or national economy and inquire further about any additional jobs Spellman can perform that courts have not considered obsolete. Thus, the Commissioner failed to meet its burden at step five. Accordingly, the Court vacates the ALJ's decision as to step five and remands Spellman's appeal for further proceedings consistent with this Memorandum and Order.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's Motion, denies Defendants' Motion, vacates the ALJ's decision as to step five of the analysis and remands Spellman's appeal for further proceedings to conduct a new analysis consistent with this Memorandum and Order.  The Clerk of the Court is respectfully directed to close this Case.


Dated: Central Islip, New York  **SO ORDERED**
   August 21, 2023

          /s/ Steven I. Locke
          STEVEN I. LOCKE
          United States Magistrate Judge